

**SIGNED this 1 day of August, 2013.**

_____
**James P. Smith**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 11 |
| | : | Case No. 11-31083-JPS |
| JAMES M. DONNAN, III | : | |
| MARY W. DONNAN, | : | |
| Debtors | : | |
| | : | |
| VALERIE V. FENNELL, | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | Adversary Proceeding |
| | : | No. 11-3088 |
| JAMES M. DONNAN, III | : | |
| Defendant | : | |

BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

    For Defendant :               Ernest V. Harris
                                          Harris & Liken, LLP
                                          P. O. Box 1586
                                        Athens, Georgia 30603

                                          Edward D. Tolley
                                        Cook, Noell, Tolley & Bates
                                        P. O. Box 1927
                                        Athens, Georgia 30603

    For Plaintiff:                 R. Keegan Federal, Jr.
                                          Federal & Hasson, LLP
                                          Two Ravinia Drive
                                          Suite 1776
                                          Atlanta, Georgia 30346

                                          William L. Rothschild
                                        Ogier, Rothschild, & Rosenfeld, PC
                                          170 Mitchell Street, S.W.
                                          Atlanta, Georgia 30303-3424

                                          John W. Timmons, Jr.
                                          Timmons Warnes & Anderson LLP
                                          244 E. Washington Street
                                          Athens, Georgia 30603

## MEMORANDUM OPINION

Before the Court is Plaintiff's complaint to deny discharge of debt under 11 U.S.C.

§ 523(a).  The issue presented is whether Plaintiff has established, by a preponderance of the

evidence, that Debtor James M. Donnan, III ("Donnan") knowingly participated in a Ponzi

scheme[1] perpetrated by GLC Limited[2] ("GLC") on Dr. Stephen S. Fennell ("Dr. Fennell"),

who, along with many others, invested money in GLC after being introduced to GLC by

Donnan.  The matter having come on for trial, the Court, as explained below, finds that

Plaintiff has not carried her burden and that the debt at issue is dischargeable in bankruptcy.

## FINDINGS OF FACT

Background

Donnan is a resident of Athens, Georgia, a former television and radio football

analyst and was head coach for the University of Georgia football team from 1996 through

2000.  GLC was initially in the business of buying and selling consumer products.  Donnan

became associated with GLC in 2007.  Dr. Fennell was a golf friend of Donnan's and a

successful maxillofacial surgeon in Athens.  After learning of GLC through Donnan,

---

[1]  "The term 'Ponzi scheme' is derived from Charles Ponzi, a famous Boston
swindler.  With a capital of $150, Ponzi began to borrow money on his own promissory
notes at a 50% rate of interest payable in 90 days.  Ponzi collected nearly $10 million in 8
months beginning in 1919, using the funds of new investors to pay off those whose notes
had come due.  Generically, a Ponzi scheme is a phony investment plan in which monies
paid by later investors are used to pay artificially high returns to the initial investors, with the
goal of attracting more investors."  U.S. v. Silvestri, 409 F.3d 1311, 1317 n.6 (11th Cir.)
(quotations and citations omitted) cert. denied, 546 U.S. 1048, 126 S.Ct. 772, 163 L.Ed. 598
(2005)

[2]  GLC is an acronym for Global Liquidation Company or Global Liquidation Center.

Dr. Fennell made two investments in GLC in May and August 2010, totaling $450,000.

Dr. Fennell died on May 30, 2011, after a long battle with cancer.  Plaintiff, his widow, is

the executor of his estate.

GLC, while initially conducting a legitimate inventory liquidation business,

ultimately devolved into a Ponzi scheme.  Between 2007 and 2010, approximately 103

individuals and entities (including Dr. Fennell) invested over $81 million in GLC for the

supposed purchase of inventory by GLC.  However, during that period of time, GLC

purchased approximately $11 million in inventory and had gross sales of approximately $6

million.  Nevertheless, during that time, GLC paid its investors over $70 million.  Thus, it is

clear that the principal source of funds for payment to the investors was the money other

investors were putting into GLC, the classic Ponzi scheme model.

Ultimately, the Ponzi scheme collapsed, with Dr. Fennell and many other investors

remaining largely unpaid.  On February 28, 2011, GLC filed a voluntary Chapter 11 petition

in the United States Bankruptcy Court for the Southern District of Ohio.  On October 29,

2011, an order confirming a plan of liquidation was entered in the GLC bankruptcy case.

James Burritt, who had served as GLC's Chief Restructuring Officer, was appointed Plan

Administrator.[3]

---

[3]  Although the GLC bankruptcy case was mentioned numerous times during the trial
of this adversary proceeding, these specific facts were not introduced into evidence.
Accordingly, in order to provide context for this adversary proceeding, the Court, pursuant to
Fed. R. Evid. 201, takes judicial notice of these facts.  See In re GLC Limited, Ch. 11 Case
No. 11-11090 (Bankr. S.D. Ohio filed February 28, 2011).

Procedural Posture

Donnan and his wife, Mary W. Donnan[4], filed their joint voluntary Chapter 11

petition on July 1, 2011.  Their joint plan of liquidation was confirmed by order entered July

27, 2012, pursuant to which practically all of their non-exempt assets were transferred to a

trust to be liquidated by a liquidating trustee.

On October 27, 2011, Plaintiff timely filed her complaint objecting to the

dischargeability of the claim of $427,500[5] which Dr. Fennell's estate allegedly held against

Donnan.  Donnan timely answered the complaint, denying that any grounds existed to deny

discharge of the debt.  The case was tried by the Court sitting in Athens, Georgia, on

October 30, 2012, November 1, 2012, January 29, 2013, January 31, 2013, and March 18,

2013.[6]  Over the course of the trial, Plaintiff, Donnan, Burritt and seven investors testified

and 46 exhibits containing over 500 pages were introduced.  At the conclusion of Plaintiff's

case, Donnan's counsel made a motion for judgment against Plaintiff pursuant to

Bankruptcy Rule 7052 and Fed. R. Civ. P. 52(c), arguing that Plaintiff had failed to establish

her case.  However, the Court, pursuant to Rule 52(c), declined to render judgment until the

close of the evidence.

After the trial, at the Court's request, the parties submitted proposed findings of fact

---

[4]   Mary Donnan is not a party to this adversary proceeding.

[5]   The parties stipulated that this amount has been reduced to $310,617 as a result of payments Dr. Fennell received prior to his death and payments received by Plaintiff from the GLC and Donnan bankruptcy cases.

[6]   This Court shares the Athens, Georgia federal courtroom with two District Court Judges.  Because each judge sharing the courtroom has his own full calendar of cases that must be heard in Athens, it was not possible to hear this case over consecutive days.

and conclusions of law, followed by replies by each party.  Having considered the evidence,

the filings by the parties and the relevant legal authorities, the Court now publishes its

findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1), made applicable

to this adversary proceeding by Bankruptcy Rule 7052.

GLC

      GLC was started in 2004 by Greg and Linda Crabtree.  Until Burritt was retained as

Chief Restructuring Officer in December 2010, the Crabtrees were GLC's only officers and

directors, and were primarily responsible for its operations.  The Crabtrees resigned their

positions with GLC on February 21, 2011.

      GLC raised capital for its operations from private, third-party investors.  Investors

were presented with two types of investment opportunities.  In some cases, investors were

told that they were funding the purchase of specific inventory that had already been presold

at a high profit margin.  In other cases, they were told they were funding the purchase of

close-out seasonal goods (such as Christmas decorations or patio furniture) that would be

stored and sold the next season.  Most, though apparently not all, investors signed a two

paragraph contract[7] with GLC pursuant to which GLC agreed to repay the investment plus a

very high rate of return (up to 150% on an annualized basis) at dates certain.  Some contracts

also allowed the investor to automatically roll the repayments into new investments.

Investors included several nationally known college coaches, car dealership owners, doctors,

contractors, real estate developers, bankers, and other highly successful individuals (or

---

[7]   Burritt testified that he was unable to find written contracts for all investors and
one investor testified that he never received any contracts for his investments.

entities formed by these individuals) with various business backgrounds.

At various times, GLC operated from six locations in West Virginia, Ohio, Tennessee, Indiana and North Carolina.  Over the years, GLC opened and closed numerous speciality stores from which merchandise was sold.  Some of the third-party investors were involved in opening these speciality stores.  In 2010, GLC owned trucks, fork lifts and equipment, had forty employees with a monthly payroll of over $61,000 and had four warehouses full of inventory.

<u>Donnan's Involvement</u>

Donnan met Greg Crabtree in spring 2007 through a mutual friend, Dan Shoemaker.  His first transaction involving Crabtree was to loan Shoemaker $25,000 for Shoemaker to invest in a deal with Crabtree for the purchase and sale of TVs, refrigerators and other appliance overruns.  The transaction was apparently successful because Donnan was repaid.

Thereafter, Crabtree asked Donnan to make a loan to him to buy merchandise that could be resold at a profit.  Donnan made the loan which was repaid with interest.  Donnan then introduced Crabtree to Maurice Koury, the owner of Carolina Hosiery Mills in Burlington, North Carolina.  Koury was a friend of Donnan from the early 1970s when Donnan was an assistant football coach at the University of North Carolina. Koury was a wealthy and highly successful businessman in the areas of clothing manufacturing, real estate and sporting goods.  GLC began doing business with Koury by purchasing for resale excess hosiery and socks from Carolina Hosiery.

Koury and Donnan also began making loans to GLC to purchase merchandise for resale.  Although some of these investments were not successful, most of them were,

resulting in a high rate of return.

Until early 2008, Koury and Donnan were the only individuals loaning money to

GLC.  Koury's Chief Financial Officer, Milt Perry, was doing due diligence on these

transactions, such as reviewing invoices, purchase orders and sales.  Although Donnan knew

nothing about the business of inventory liquidation, he participated in the transactions in

reliance on Perry's due diligence and Koury's business experience and participation.

Donnan, Koury and Crabtree also invested in a retail store in Burlington, North Carolina,

opened by GLC for the sale of overruns of appliances and Koury's hosiery products.

Beginning in spring 2008, Donnan first began discussing the GLC investments with

other people.  Crabtree would send Donnan a fax or call him to tell him about potential

deals, what the profit on the deals would be and ask Donnan to attempt to raise the money to

finance the deals.  Donnan would then approach friends and acquaintances, tell them about

the potential deals and ask if they wanted to invest.[8]  In addition, by word of mouth, other

potential investors learned of the success that Donnan and other investors were having with

GLC.  Those potential investors would approach Donnan to inquire about their participation

in future deals.  Donnan would then call Crabtree to see what was available, report the

information to the potential investors, and inquire as to whether they wanted to participate.

In some instances, Donnan would report that no deals were available at that time.  Donnan

testified that his role was solely raising funds for the deals as described by Crabtree.

Donnan testified that he was not involved in any way in negotiating or implementing the

---

[8]  Testimony at trial established that there were a number of investors who had
invested in GLC without being contacted by Donnan.  Accordingly, Crabtree was apparently
also calling others to assist him in raising funds.

underlying transactions.  Rather, Donnan testified, Crabtree was solely responsible for the inventory transactions.

As stated earlier, from 2007 through 2010, over 103 individuals and entities made investments in GLC.  Donnan was one of, if not the primary person raising funds for GLC.[9] Further, Donnan and his family were among the largest and most successful investors, investing $6,020,870 in GLC for which they received $14,578,916, a profit of $8,558,046. In addition, Donnan received over $2 million in commissions for the funds he raised.[10]

In late January 2010, Donnan met with a number of the larger investors to discuss GLC's operations and opportunities.  As stated in a confirming memorandum prepared by one of the investors, the meeting:

> addressed the discussion as if, GLC, is a new, yet to be
> incorporated company, which enabled us to take a blank sheet
> of paper approach and create a simple structure.  Our plan will
> include the necessary checks and balances to address possible
> investor concerns, again by creating a business structure,
> which will protect our personal investments and yet encourage
> the company to continue pursuing aggressive growth.
> Therefore, the advisory committee mission is as follows;
>
> "To offer suggestions to foster and enhance the present
> opportunities for which we are very grateful to be part of and

---

[9]  Testimony at trial on the extent of Donnan's involvement was in conflict. Testimony ranged from his being responsible for 36, 60, 70 or 85 of the 103 investors. Under any version, it is clear that Donnan's role in raising investor funds for GLC was substantial.

[10]  Donnan testified that he did not receive a commission on all the funds he raised. He testified that on the deals where he did receive a commission, he only received a commission where the deal involved was successful and after the investors in that deal had received their promised return.  Burritt seemed to confirm this by testifying that Donnan's commissions did not affect the return which investors received.  Donnan also testified that there were other people who received commissions for raising funds for GLC.

look forward to continued participation".[11]

This "advisory committee" recommended an audit of GLC's records, a review of its

tax filings and a system of checks and balances to separate GLC's funds from Crabtree's

retail operations.  They recommended the creation of a "Georgia GLC, LLC", with Donnan

as CEO.  They made several other recommendations as to how the business could be

continued in the event something happened to Crabtree and how the business might be

expanded to additional geographical areas.  Donnan testified that he was not interested in

becoming CEO because he did not understand the business of buying and selling inventory

and had other interests, including his grandchildren, which occupied his time.  However, he

did agree to their request that he open a bank account at First Sentry Bank in West Virginia

to keep the investment money separate from Crabtree's retail operations and be a signator on

that account.  This account was opened by GLC in January 2010.  There was no other

testimony as to additional actions taken by the "advisory committee" or its

recommendations.

Until July 2010, it appeared that all of the investor transactions were successful and

investors received repayment as promised.  However, in early July 2010, Crabtree sent

Donnan a fax advising him that one of the deals would have to be restructured because it

was not closing as expected.  This deal, involving Christmas inventory and only one

investor, was to have been repaid in full by August 1, 2010.  Crabtree advised Donnan in the

fax that it would have to be restructured for payments to be made periodically through

September 2010.  Subsequently, in September, Donnan asked Crabtree about the status of

---

[11]  See Defendant's Exhibit 2.

this deal and Crabtree stated that he still had not been paid for the merchandise, but felt

confident the deal would eventually close.  At this same time, another investor who had

visited the warehouses of GLC reported to Donnan his concern that there was insufficient

inventory to accomplish the various agreements which GLC had outstanding.

At this point, Donnan contacted three other investors with business backgrounds in

accounting, manufacturing and inventory liquidation and asked them to go with him to

GLC's office and warehouse in Huntington, West Virginia to investigate GLC's inventory

and operations.  This group made three trips to Huntington during October 2010.

After the second trip, the group talked to Crabtree about the need to obtain

professional help to restructure GLC.  Several investors and Crabtree interviewed different

restructuring groups by telephone conference call and retained the firm of Conway

McKenzie to do an analysis of GLC.  The group also retained counsel to make

recommendations on restructuring GLC.

At the conclusion of the last trip, the group met with Crabtree to discuss with him

their concerns over GLC's operations and possible solutions.  At this meeting, Crabtree

disclosed that he had begun to use investor money to pay back other investors.  Donnan

testified that this was when he learned of the fraud for the first time.  At that point, between

fifteen and twenty investors (including Donnan) from the Athens, Georgia area formed an ad

hoc creditors committee, hired counsel and began investigating GLC's operations.  This led

to the hiring of James Burritt of Mainstream Management who, on December 7, 2010,

became Chief Restructuring Officer of GLC.

Burritt's Investigation

Burritt and his management team discovered that GLC had almost no financial records regarding its operations or the investors. The management team had to rebuild the records of the company from bank records obtained from the various banks where GLC had accounts. With significant assistance from Donnan, the management team was able to develop a list of investors and obtain copies of some of their investment contracts.

Burritt testified that he was unable to find any record where specific inventory had been purchased with specific investor funds as those investors had been promised. His team found the warehouses containing the inventory to be in complete disarray, filled with every type of consumer product imaginable. However, there was no inventory control system in place to keep track of the inventory, its cost or value. Much of the inventory, such as outdated food and over-the-counter medicines, was not saleable. His team determined that the cost value of the inventory was approximately $7.7 million.

After recreating the records of the company, Burritt's team was able to track, for the period of 2008 through 2010, the amount of money invested in GLC, the amount of inventory purchased, the sale of inventory and the returns paid to investors. They determined that GLC became insolvent in 2008. An analysis of the records established that GLC was more in the business of bringing in investment capital than producing income from sales. The analysis established that most of the money from investors was used to pay other investors, rather than to purchase inventory or create sales.

The Fennell Transaction

Dr. Fennell, Donnan and several other men were golf friends at a country club in

Athens, Georgia.  Through this association, all of them were aware that Donnan was

successfully investing in GLC, as this was a frequent topic of conversation during their golf

matches.  Frequently during their golf games, Donnan would take calls from Crabtree to

discuss potential deals.  Over the years, many in the golf group became GLC investors.

In April 2010, Donnan and one of his golf friends were attending the Master's golf

tournament in Augusta, Georgia.  While there, they ran across Dr. Fennell, who was

attending with other friends.  Dr. Fennell approached Donnan and told him that he wanted to

make an investment in GLC.  The next week, the two got together at the golf course in

Athens, and Donnan explained to Dr. Fennell how the deal would work.  Dr. Fennell had

already obtained an investment contract from GLC and signed it there in Donnan's presence.

Dr. Fennell then wire transferred $150,000 to GLC's bank account at First State Bank in

West Virginia[12].  On or about August 2, 2010, Donnan delivered to Dr. Fennell two checks

totaling $22,500 drawn on the First State Bank account and signed by Crabtree as the first

return on this investment.

Subsequently, Dr. Fennell discussed with another golf friend investor a transaction

involving patio furniture which GLC would buy as an end of season close-out deal to be sold

the following season.  This friend had successfully participated in a similar GLC patio deal

the year before.  Dr. Fennell subsequently advised Donnan that he wanted to make a

$300,000 investment in the patio deal.  Dr. Fennell obtained a contract from GLC and

Donnan provided him with wiring instructions to GLC's bank account at First Sentry

---

[12]  Donnan was not a signator on this account.

Bank.[13]  Dr. Fennell did not receive any payment on this investment.

## CONCLUSIONS OF LAW

Plaintiff seeks to bar discharge of the claim by Dr. Fennell's estate on the grounds

that the claim was incurred as a result of false pretenses, false representation or actual fraud

(11 U.S.C. § 523(a)(2)(A)), embezzlement (§ 523(a)(4)) and willful and malicious injury

(§ 523(a)(6)).[14]  Plaintiff has the burden of proving by a preponderance of the evidence that

the  claim is nondischargeable under one of these sections.  Grogan v. Garner, 498 U.S. 279,

111 S.Ct. 654, 112 L.Ed. 2d 755 (1991).  If Plaintiff fails to prove any of the elements of the

claim,

> ...the debt is dischargeable.  Moreover, courts generally
> construe the statutory exceptions to discharge in bankruptcy
> "liberally in favor of the debtor," and recognize that " '[t]he
> reasons for denying a discharge...must be real and substantial,
> not merely technical and conjectural.' " In re Tully, 818 F.2d
> 106, 110 (1st Cir. 1987) (quoting Dilworth v. Boothe, 69 F.2d
> 621, 624 (5th Cir. 1934)); see also, Boyle v. Abilene Lumber,
> Inc., (Matter of Boyle), 819 F.2d 583, 588 (5th Cir. 1987).
> This narrow construction insures that the "honest but
> unfortunate debtor" is afforded a fresh start.  Birmingham

---

[13]  Plaintiff testified that Donnan came to the Fennells' residence one evening when
Dr. Fennell was very ill and pressured Dr. Fennell to make the $300,000 investment.
Donnan denied that he pressured Dr. Fennell to make this investment and denied ever
coming to Dr. Fennell's house until he visited the family the day of Dr. Fennell's funeral.
Testimony by others about their discussion with Dr. Fennell about the patio deal and about
Donnan's visit after Dr. Fennell's funeral was consistent with Donnan's testimony.

[14]  In her proposed findings of fact and conclusions of law, Plaintiff also makes
arguments regarding alleged violations of federal and state securities laws.  Although one
week before the last day of trial Plaintiff sought to amend her complaint to add a securities
law violation claim under 11 U.S.C. § 523(a)(19), she orally withdrew her request to amend
at the beginning of the last day of trial.  Accordingly, the Court will not consider any
arguments relating to the violation of federal or state securities laws.

   Trust Nat'l Bank v. Case, 755 F.2d 1474, 1477 (11th Cir.
1985)...

Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994).

Plaintiff's Claim Against Debtor

   In order to establish an exception to discharge under 11 U.S.C. § 523(a), a creditor

must have a claim against the debtor.  On August 22, 2011, Plaintiff timely filed her proof of

claim asserting a claim against Donnan (Claim No. 13-1).  However, it is undisputed that the

two agreements pursuant to which Dr. Fennell invested in GLC are between GLC and

Dr. Fennell.  It is also undisputed that the funds went to GLC and not to Donnan.[15]

   In his second affirmative defense to the complaint filed in this adversary proceeding,

Donnan asserts that he owes no debt to Plaintiff because Dr. Fennell invested in GLC.  In his

sixth affirmative defense, Donnan asserts:

>    Plaintiff has no claim for money damages against Defendant.
>    At best, Plaintiff may have an allowable claim in this
>    bankruptcy case for which she may receive a distribution
>    pursuant to the terms of a Plan as long as her claim is not
>    preempted by the claim of GLC and Plaintiff proves that
>    Defendant is personally indebted to her.

Then, in his seventh affirmative defense, Donnan asserts, in part, "Defendant objects to the

allowance of the proof of claim filed by Plaintiff as she has no claim against Defendant."

   Plaintiff alleges in her complaint that Dr. Fennell made these investments in GLC as

a result of fraud committed by Donnan.  Numerous courts have found that a creditor who

---

   [15]  Although Plaintiff argues that Donnan received the funds, the evidence was
undisputed that Dr. Fennell wired his investments to bank accounts in the name of GLC.
There was no evidence tracing Dr. Fennell's investments to the distributions which Donnan
or members of his family received.

provides services to or loans money to a corporation or limited liability company has, for

purposes of section 523(a), a claim against an individual debtor who acted as agent of the

artificial entity and who personally committed the tortious acts complained of.  See, e.g.,

Deady v. Hanson (In re Hanson), 432 B.R. 758, 781 (Bankr. N.D. Ill. 2010), aff'd 470 B.R.

808 (N.D. Ill. 2012); Mairoll v. Zaffron (In re Zaffron), 303 B.R. 563, 569-70 (Bankr. E.D.

N.Y. 2004); Southern Concrete Constr. Co. v. Lennard (In re Lennard), 245 B.R. 428, 431

(Bankr. M.D. Ga. 1999); Mendez v. Cram (In re Cram), 178 B.R. 537, 541 (Bankr. M.D.

Fla. 1995); In re Arm, 175 B.R. 349, 352-53 (9th Cir. B.A.P. 1994), aff'd 87 F.3d 1046, (9th

Cir. 1996).  Although he has denied any wrongdoing, Donnan's confirmed Chapter 11 plan

provides for the recognition and payment of all "allowed" claims of parties who invested in

GLC after being contacted by Donnan.  Consistent therewith, while Donnan objects to the

claim of Plaintiff in his answer, his answer seeks to make a distinction between allowance of

her claim for purposes of plan distribution and for purposes of section 523(a).[16]

　　　As will be explained below, Plaintiff has failed to carry her burden with respect to

other elements of sections 523(a)(2), (4) and (6).  Accordingly, for purposes of this opinion,

the Court will assume, without deciding, that Plaintiff has a claim against Donnan for

purposes of section 523(a).

Count I - Fraud

　　　11 U.S.C. § 523(a)(2)(A) bars the discharge of debts resulting from "false pretenses,

---

[16]  Perhaps, for this reason, Donnan has not sought to prevent the Liquidating Trustee
under his Chapter 11 plan of liquidation from making payments to Plaintiff.  The parties
stipulated that on November 29, 2012, Plaintiff received a distribution in the Donnan
Chapter 11 case of $44,476.

a false representation, or actual fraud...”

> The elements of a claim under § 523(a)(2)(A) are: the debtor
> made a false statement with the purpose and intention of
> deceiving the creditor; the creditor relied on such false
> statement; the creditor's reliance on this false statement was
> justifiably founded; and the creditor sustained damage as a
> result of the false statement.

Johannessen v. Johannessen, 76 F.3d 347, 350 (11th Cir. 1996).

> Because direct proof of intent (i.e., the debtor's state of mind)
> is nearly impossible to obtain, the creditor may present
> evidence of the surrounding circumstances from which intent
> may be inferred.

Caspers v. Van Horne (Matter of Van Horne), 823 F.2d 1285, 1287 (8th Cir. 1987),

abrogated on other grounds by Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed 2d

755 (1991).  Further, reckless indifference or disregard for the truth constitutes a "false

representation" under section 523(a)(2)(A).  Birmingham Trust Nat. Bank v. Case, 755 F.2d

1474, 1477 (11th Cir. 1985).

Plaintiff contends that Donnan acted with intent to deceive when he made

representations to Dr. Fennell about investing in GLC for the purpose of purchasing

inventory when Donnan knew that GLC was operating a Ponzi scheme.  However, there was

no direct evidence introduced at trial to show that Donnan had prior knowledge of the Ponzi

scheme.  Donnan testified that he did not learn that Crabtree was funding investor

repayments from later investments until October 2010, when Crabtree made the confession

to Donnan and other investors.  There was no direct evidence to contradict Donnan's

testimony.

Relying on a series of cases arising out of Ponzi schemes involving fraudulent

conveyance avoidance actions under 11 U.S.C. § 548(a)(1)(A),[17] Plaintiff argues that proof

of the existence of a Ponzi scheme, by itself, establishes Donnan's actual intent to commit

fraud.  Plaintiff argues:

> Actual intent to hinder, delay or defraud may be established,
> as a matter of law, where the debtor runs a Ponzi scheme or a
> similar illegitimate enterprise, because transfers made in the
> course of a Ponzi operation could have been made for no
> purpose other than to "hinder, delay or defraud" creditors.
> Thus, the mere existence of a Ponzi scheme is sufficient to
> establish the actual intent to "hinder, delay, or defraud"
> creditors under 11 U.S.C. § 548(a)(1)(A).[18]

It is true that courts have uniformly held that proof of the existence of a Ponzi

scheme establishes fraudulent intent for purposes of avoiding fraudulent transfers under 11

U.S.C. § 548(a)(1)(A).  For instance, in the case of Barclay v. MacKenzie (In re AFI

Holding, Inc.), 525 F.3d 700 (9th Cir. 2008), the trustee of a debtor corporation that had

operated a Ponzi scheme brought a fraudulent conveyance action under section 548(a)(1)(A)

against an investor who had received a return greater than his original investment.  The

investor argued that the trustee had not proven that the debtor corporation made transfers to

him, with "actual intent to hinder, delay or defraud" as required by section 548(a)(1)(A).

The Court of Appeals held that, in light of the guilty plea by the principal of the debtor

corporation in which the principal admitted that he operated a Ponzi scheme, the existence

of the Ponzi scheme established the actual intent required under section 548(a)(1)(A).  All of

---

[17]  Under 11 U.S.C. § 548(a)(1)(A), a trustee may recover from third parties transfers of property made by the debtor "with actual intent to hinder, delay or defraud" the debtor's creditors.

[18]  See Plaintiff's Response to Defendant's Proposed Findings of Fact and Conclusions of Law, Docket Number 59, p. 14.

the other cases cited by Plaintiff are consistent with this proposition and in each case the

debtor or the principal of the debtor had either confessed or was found by the court to have

knowingly operated a Ponzi scheme.  See, e.g., Emerson v. Maples (In re Mark Benskin &

Co.), 59 F.3d 170 (Table), 1995 WL 381741 (6th Cir. 1995), cert. denied 516 U.S. 1072, 116

S.Ct. 774, 133 L.Ed 2d 726 (1996) (debtor who operated Ponzi scheme pled guilty to mail

and securities fraud); Hayes v. Palm Seedlings Partners (In re Agric. Research and

Technology Group, Inc.), 916 F.2d 528 (9th Cir. 1990) (corporate debtor's principal pled

guilty to Ponzi scheme); Conroy v. Shott, 363 F.2d 90 (6th Cir.), cert. denied 385 U.S. 969,

87 S.Ct. 501, 17 L.Ed 2d 433 (1966) (court found defendant knew about debtor's Ponzi

scheme; Plotkin v. Pomona Valley Imports, Inc. (In re Cohen), 199 B.R. 709 (9th B.A.P.

1996) (debtor's operation of Ponzi scheme provided actual fraudulent intent element to

avoid transfers as fraudulent); McHale v. Boulder Capital LLC (In re The 1031 Tax Group,

LLC), 439 B.R. 47 (Bankr. S.D. N.Y. 2010) (principal convicted); SIPC v. Old Naples

Securities, Inc. (In re Old Naples Securities, Inc.), 343 B.R. 310 (Bankr. M.D. Fla. 2006)

(debtor's principal pled guilty to Ponzi scheme); Bauman v. Bliese (In re McCarn's Allstate

Finance, Inc.), 326 B.R. 843 (Bankr. M.D. Fla. 2005) (debtor's principal pled guilty to Ponzi

scheme; Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R.

103 (Bankr. E.D. Pa. 2002) (debtor's principal admitted Ponzi scheme).  However, Plaintiff

has not cited, nor has this Court found, any case where a court has held that proof of the

existence of a Ponzi scheme is sufficient to supply the required fraudulent intent under

section 523(a)(2)(A) where the debtor has not admitted, or been found by the court, to have

knowingly participated in the scheme.

As the Eleventh Circuit has held:

> ...bankruptcy laws are designed to provide relief for the honest
> but unfortunate debtor.  Brown v. Felsen, 442 U.S. 127, 128,
> 99 S.Ct. 2205, 2207, 60 L.Ed 2d 767 (1979).  By creating the
> fraud exceptions to discharge, Congress sought to discourage
> fraudulent conduct and ensure that relief intended for honest
> debtors does not inure to the benefit of dishonest ones.  See In
> re Wilson, 12 B.R. 363, 370 (Bankr. M.D. Tenn. 1981).
> Similarly, we conclude that one of the purposes of the fraud
> exceptions to discharge is to punish the debtor for engaging in
> fraudulent conduct.

Birmingham Trust Nat. Bank v. Case, 755 F.2d at 1477.  Therefore, in order to preclude the

discharge of a debt under section 523(a)(2)(A):

> The debtor must be guilty of positive fraud, or fraud in fact,
> involving moral turpitude or intentional wrong, and not
> implied fraud, or fraud in law, which may exist without the
> imputation of bad faith or immorality.

Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir. 1986).  For this reason, the

fraud of a third party is imputed to a debtor in only limited circumstances, none of which

apply here.  See Hoffend v. Villa (In re Villa), 261 F.3d 1148 (11th Cir. 2001), cert. denied

535 U.S. 1112, 122 S. Ct. 2328, 153 L.Ed 2d 159 (2002).

To "punish" a debtor who has not knowingly participated in a fraud would be

contrary to the purposes of the bankruptcy laws.  Accordingly, the Court rejects Plaintiff's

argument that proof of the Ponzi scheme alone, without proof of Donnan's knowing

participation therein, is sufficient to supply the element of intent required under section

523(a)(2)(A).

Plaintiff contends that Donnan's knowledge of the Ponzi scheme is established by

the fact that he kept notes regarding the investments and expected returns by the investors

and gave GLC employees instructions as to when payments should be made to the investors.

However, Donnan testified, without contradiction, that he kept those notes regarding the

investments because he did not know if anyone else was keeping track of the investments

and when the payments were due.  Nothing in those notes suggests that Donnan was aware

that the underlying transactions for the purchase and sale of merchandise were fictitious and

not being implemented as represented by Crabtree.

Plaintiff argues that Donnan's knowledge of the Ponzi scheme is evidenced by

certain "agreements" between Donnan and Crabtree (prepared in Donnan's handwriting)

which were introduced at trial.  Some of these documents refer to Donnan and Crabtree as

being "partners" or having a "joint venture".  The documents describe agreements for

Donnan and Crabtree to buy and sell products with money invested by them and other

investors (named in some of the documents).  Some of the documents state the amounts and

timing of repayments of principal and interest to the investors.  Others state that the returns

are to be determined later.  These documents, dated in 2008 and 2009, were signed by

Donnan, Crabtree and their wives.

Donnan testified that he prepared these agreements because he wanted to make sure

that their wives would have a record of the investments that had been made in the event

something happened to him or Crabtree.  He stopped preparing these documents when his

assistant, Jennifer Gilcrese, began keeping up with the investments on her computer.  His

testimony showed that, as a layperson, he ascribed no legal meaning to the use of the words

"partner" and "joint venture".  In any event, all of the documents make reference to specific

product deals and there is simply nothing in these documents that would suggest that

Donnan knew that the underlying deals were fictitious.[19]

Plaintiff argues that Donnan was a signator on the GLC bank account at First Sentury Bank.  Plaintiff argues that Donnan's making payments to investors from this account, into which investor money was being deposited, establishes that Donnan knew that investor money was being used to pay investors.  Plaintiff's argument would have merit had she provided a tracing of the funds in and out of this account to show that investors funds were diverted to other investors.  However, what little evidence was introduced about this account does not support this argument.

Plaintiff introduced what appears to be portions of the April and May 2010 statements[20] and the entire September 2010 statement[21] for the First Sentury Bank account.  However, no testimony explaining the deposits, checks, wire transfers and other entries on

---

[19]  To the extent that Plaintiff argues that the fraud of Crabtree should be imputed to Donnan because they were "partners", the evidence does not establish any partnership.  Even though Donnan used the terms "partner" and "joint venture" in the "agreements" he drafted in 2008 and 2009, except to the extent of his own investments in the transactions in which he participated, there is no evidence that he agreed to share in any losses from the inventory transactions being financed by Crabtree or any of the other investors, nor is there any evidence that he had any right to direct or control the underlying transactions or the business of GLC.

> Nomenclature is not dispositive, and we must look at other documents to see whether a partnership had in fact been created.  Whether a partner in a joint venture is a party to a legal "partnership" is a question of fact and depends on the rights and responsibilities assumed by the joint venturers, i.e., a sharing of the fruits and losses with an equal right, expressed or implied, to direct and control the conduct of the enterprise.

Jerry Dickerson Presents, Inc. v. Concert/Southern Chastain Promotions, 206 Ga. App. 316, 323, 579 S.E.2d 761, 768 (2003).

[20]  See Plaintiff's Exhibit 9.

[21]  See Plaintiff's Exhibit 45.

those statements was introduced.  The only statement introduced (the August 2010

statement)[22] about which there was testimony established that not only was investor money

deposited into this account, but also funds from a money market account, the source of

which was undisclosed.  While checks were written to investors from this account, transfers

for the purchase of merchandise (perfume and patio furniture) were also made.  Therefore, it

was not established that the payments to investors from this account necessarily came from

investor deposits (thus evidencing a Ponzi scheme), and the use of the funds from this

account to purchase merchandise was consistent with Donnan's belief that the transactions

were legitimate.

Plaintiff also argues that Donnan should have known about the Ponzi scheme and

acted with reckless disregard for the truth.  However, the evidence does not support this

argument.

Donnan testified at trial that he was not familiar with the purchase and sales aspect

of the business.  Rather, when he first started investing in GLC, he simply followed the lead

of Koury and Koury's financial officer, who was conducting due diligence.  In addition,

several investors testified that they had conducted their own investigation of GLC and

thereafter met with Crabtree and Donnan to discuss expanding the GLC business.  One of

these investors, who had considerable experience in the inventory liquidation business,

testified that the high rates of return being realized on the GLC investments were not out of

line with returns that he had obtained in his own business.  Further, in early 2010, Donnan

had accompanied Crabtree and another investor to Las Vegas to a convention involving the

---

[22] See Plaintiff's Exhibit 44.

liquidation business at which over 7,000 people were in attendance. They met with a representative of a large national retailer who discussed with them deals that he had done with Crabtree and discussed possible future deals. They also observed Crabtree negotiating several deals for the purchase and sale of inventory. All of this information led not only Donnan, but several sophisticated and successful businessmen to believe that GLC was a legitimate business. Accordingly, the evidence does not establish that Donnan should have known of the Ponzi scheme or acted with reckless disregard for the truth.

The Court also notes that, on December 6, 2010, the ad hoc committee of investors formed after Crabtree's confession met with Conway McKenzie and the law firm of Morris, Manning & Martin to discuss options for salvaging the GLC situation. The minutes of this meeting were introduced by Plaintiff at trial without objection.[23] Crabtree, although not present during the initial part of the meeting, was asked to attend (as Donnan is quoted in the minutes) "to face the music". After later joining the meeting, Crabtree was subjected to harsh questioning by the investors, including Donnan, about what he had done and how the situation had evolved. Crabtree explained that the problems with GLC had begun around 2009 when "he was building the business-it just got too big, too fast". The Court finds it revealing that, at no time, did Crabtree ever suggest in any way that Donnan had prior knowledge of the fraud, or that Donnan had knowingly participated in the fraud.

Finally, the testimony of Nelson Bowers was introduced at trial through his deposition. Bowers is a businessman from Lookout Mountain, Tennessee, and a long-time

---

[23] See Plaintiff's Exhibit 2. To the extent the minutes are hearsay, a trial court's reliance on the evidence is not error when no timely objection to its admission is made. Martin v. Arkansas Arts Center, 627 F.2d 876, 880 (8th Cir. 1980).

friend of Donnan. After learning of GLC from Donnan, Bowers invested and lost

approximately $1.5 million.  He testified that, the night before the ad hoc committee

meeting, Crabtree told him that Donnan had no knowledge that Crabtree was "taking other

people's money and paying off other investors".[24]

In conclusion, the direct and circumstantial evidence introduced at trial does not

establish by a preponderance of the evidence that Donnan was aware of or knowingly

participated in the GLC Ponzi scheme.  Since Plaintiff has failed to establish that Donnan

acted with intent to deceive, there is no need to discuss the other elements of  section

523(a)(2)(A).

Count II - Embezzlement

In Count II of her complaint, Plaintiff seeks to except from discharge the claim

against Donnan under 11 U.S.C. § 523(a)(4).  That provision provides, in relevant part, that

a debt incurred through "embezzlement" is nondischargeable.

> "Embezzlement is the fraudulent appropriation of property by
> a person to whom such property has been entrusted, or into
> whose hands it has lawfully come.  It differs from larceny in
> the fact that the original taking of the property was lawful, or
> with the consent of the owner, while in larceny the felonious
> intent must have existed at the time of the taking." 4 Collier
> on Bankruptcy ¶ 523.10[2](16th ed. 2009) (footnotes omitted).
> As with fraud, federal common law controls the definitions of
> embezzlement...for purposes of nondischargeability.  See, e.g.,
> Reilly v. Miano (In re Miano), 265 B.R. 352, 356 (Bankr. D.
> Conn. 2001).  To establish embezzlement, a plaintiff must
> show an appropriation by the debtor of funds lawfully in the
> debtor's possession, for the debtor's use or benefit, with
> fraudulent intent.  See, e.g., Kagan v. Bercu (In re Bercu), 293

---

[24]  As with the minutes of the meeting, this testimony is hearsay, but was admitted
without objection.

B.R. 806, 811 (Bankr. M.D. Fla. 2003).

Wilson Family Foods, Inc., et al. v. Brown (In re Brown), 457 B.R. 919, 926 (Bankr. M.D. Ga. 2011).

The evidence is undisputed that, pursuant to agreements with GLC, both of Dr. Fennell's investments were deposited into GLC accounts at banks in West Virginia and were thus never in Donnan's possession. Accordingly, Plaintiff has failed to establish a basis for nondischargeability under section 523(a)(4).

Count III - Willful And Malicious Injury

In Count III of her complaint, Plaintiff seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(6). That provision provides for the nondischargeability of a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity".

In the case of Maxfield v. Jennings (In re Jennings), 670 F.3d 1329 (11th Cir. 2012), the Eleventh Circuit held:

> We have held that proof of "willfulness" requires " 'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.' " In re Walker, 48 F.3d 1161, 1163 (11th Cir. 1995) (quoting In re Ikner, 883 F.2d 986, 991 (11th Cir. 1989)). "[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." Id. at 1165; See also, Kawaauhau v. Geiger, 523 U.S. 57, 61-62, 118 S.Ct. 974, 140 L.Ed 2d 90 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury). Recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). Kawaauhau, 523 U.S. at 64, 118 S.Ct. 974.

> "Malicious" means " 'wrongful and without just cause or
> excessive even in the absence of personal hatred, spite or ill-
> will.' " <u>In re Walker</u>, 48 F.3d at 1164 (quoting <u>In re Ikner</u>, 883
> F.2d at 991).  To establish malice, "a showing of specific
> intent to harm another is not necessary."  <u>In re Ikner</u>, 883 F.2d
> at 991.

<u>Id</u>. at 1334.

When the debtor has knowingly participated in a Ponzi scheme, courts have found willful and malicious injury for purposes of section 523(a)(6).  <u>See</u>, <u>e.g.</u>, <u>Paik v. Choe (In re Choe)</u>, 2012 WL 3744794 (Bankr. N.D. Cal. August 28, 2012); <u>Berman v. Hollinger (In re Berman)</u>, 248 B.R. 441 (Bankr. M.D. Fla. 2000).  However, as previously discussed, Plaintiff has failed to establish that Donnan knowingly participated in the GLC Ponzi scheme.  Therefore, Plaintiff has failed to establish that the claim arose from a "willful and malicious injury" by Donnan.

<u>CONCLUSION</u>

The Court, having determined that Plaintiff has failed to carry her burden, will enter an order dismissing Plaintiff's complaint with prejudice.  As a result of this decision, Donnan's motion under Fed. R. Civ. P. 52(c) is moot and the Court will enter an order consistent therewith.